Filed 12/30/20  P. v. Marrujo CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074406 |
| v. | (Super.Ct.No. RIF1606065) |
| RUBEN WILLIAM MARRUJO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas E. Kelly, Judge. (Retired judge of the Santa Cruz Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Ruben William Marrujo guilty of possessing methamphetamine for sale (Health & Saf. Code, § 11378) (Count 10) and possessing heroin for sale (Health & Saf. Code, § 11351) (Count 11). The jury also found defendant guilty of other crimes. The trial court sentenced defendant to prison for a term of 12 years eight months. Defendant contends the trial court erred by not sua sponte instructing the jury on the lesser included offense of simple drug possession. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

A. COUNTS 10 AND 11

On August 28, 2017, Riverside County Sheriff's investigators executed a search warrant at defendant's residence in Perris. Four people, including defendant, were inside the home. The other three people in the home were Cheryl Garza Marrujo (Cheryl)[1]; M.P., who was a minor; and Damian Hernandez, who was a nephew of either defendant or Cheryl. The investigators searched the residence.

In the master bedroom, defendant and Cheryl's names were "plastered on the wall." In the master bathroom, in a cabinet under the sink, there were several baggies of methamphetamine and heroin, a glass methamphetamine pipe, lighters, and money. The heroin was "individually wrapped and packaged." "[L]ittle individual baggies" of heroin were inside a larger plastic bag. One large bag held 34 small bindles of heroin. One of the small bindles weighed 0.15 of a gram with the packaging. Without

_____

[1] We use Cheryl's first name for the sake of clarity because she has the same last name as defendant. No disrespect is intended.

2

packaging, 0.1 of a gram is a common sale weight for heroin and would cost $10 per bag. A typical dose of heroin is 0.2 of a gram.

Another large bag held 17 small bindles of methamphetamine that each weighed approximately 0.25 of a gram. A 0.25-gram bag of methamphetamine would likely sell for $20. Another bag held nine bindles of methamphetamine. A "[c]ouple of the bags were larger bags . . . an eight ball or 8th of an ounce. And there was half of an eight ball." Altogether the methamphetamine weighed 14.15 grams with the packaging. A typical dose of methamphetamine is 0.1 of a gram.

In the master bedroom, in the bottom drawer of a nightstand, there were digital scales. There were clean balloons inside a baggie in the bedroom. Balloons can be used for packaging drugs. There were clear plastic baggies in the bedroom as well. Also in the bedroom, there was a box for a prepaid cell phone. Drug dealers commonly used prepaid cellphones. There was a baby monitor on the dresser in the master bedroom. The baby monitor showed "[t]he front yard. [Two c]ameras were found under the eaves outside of the house." "People who conduct narcotic sales will use early warning systems such as cameras, surveillance, to alert them when law enforcement is coming to give them time to either discard the narcotics . . . or . . . to hide the narcotics."

The investigators found a cell phone in the master bedroom. On the phone, an incoming text message read, "How much white would you give me for this bike?" and a photograph of a bike was provided. "White" refers to methamphetamine. The outgoing response read, "I don't have white. If I did, I would do it." Riverside County Sheriff's Investigator Joshua Rhodes understood the response to mean "they're out of meth at the

3

moment or he would do the deal." Another way one could interpret the message is the person does not have methamphetamine, but if he did then he would consume it himself.

Another incoming text message on the cell phone read, "Well, call me when you have it because I have the—and then the money signs—money right now." Investigator Rhodes understood that message to mean "the person who is contacting the owner of the phone is letting them know they have money right now and they're wanting to buy from the person who has the phone." The outgoing response read, "Okay . . . $40 right now for black." "Black" referred to heroin. That text conversation occurred on August 19, 2017.

On August 25, an incoming text message read, "I got you on your G and a half of white." Investigator Rhodes believed the message referred to one gram of heroin and half an ounce of methamphetamine, which is 14 grams. The outgoing response to that message read, "Can you bring it? We are having car problems."

Another series of incoming text messages was sent by "Gabby." One message from Gabby read, "Hey, Girl, are you up? I need one." Investigator Rhodes thought Gabby "was asking her supplier if they have any narcotics available." The next day, Gabby asked "You won't take trades?" The outgoing response was, "No, I can't do a trade." Investigator Rhodes explained that narcotics users would often trade anything of value they have for narcotics. On August 13, Gaby asked, "Would you guys take a women's Bulova watch and two gig memory for a camera for black?"

Another text message conversation involved an incoming message that read, "I'm here at the liquor store," and then a second incoming message that read, "How

much can you sell a gram of black?" Investigator Rhodes understood that message to be asking for the price of one gram of heroin. The outgoing response was, "If we do it, will be 90," which Investigator Rhodes understood to mean $90 for one gram of heroin.

Investigator Rhodes opined that the methamphetamine was possessed for sale. Rhodes's opinion was "[b]ased on the quantity, the way it was packaged, the additional packaging, the scales," and the text messages. Rhodes also opined that the heroin was possessed for sale. Rhodes explained that a person possessing drugs for personal use would not have "quantities this large."

B.    PRIOR POLICE INTERACTIONS

In the instant case, defendant was charged with crimes that occurred on December 15, 2016, and January 25, 2017, as well as the crimes described *ante* in August 2017. On December 15, 2016, Riverside County Sheriff's Deputies executed a search warrant at defendant's house. Defendant was fidgety, his speech was rapid, and he had old track marks on his arms. Riverside County Sheriff's Deputy Daniel Brown opined that defendant was under the influence of methamphetamine and heroin.

On January 25, 2017, Riverside County Sheriff's investigators went to defendant's house to assist child welfare workers. Defendant's speech was rapid, and his pupils were dilated. Riverside County Sheriff's Investigator Robert MaCrae opined that defendant was under the influence of methamphetamine. People who consumed drugs would often sell drugs to support their own drug habit.

C.    TRIAL

In the trial court, the following discussion occurred:

5

"The Court: And with respect to lesser includeds, we did the lesser included for the simple child abuse, the misdemeanor. And you weren't—either of you were requesting any other lesser includeds.

"[Defendant's counsel]: That's correct.

"[Codefendant's (Cheryl's) Counsel]: Correct.

"The Court: All right. Then I concur with that. I did not see a sua sponte duty to instruct on any other lesser other than the simple child abuse."

During closing argument, defendant's trial counsel conceded that defendant was a drug addict. Defense counsel also conceded that some of the charges had been proven beyond a reasonable doubt. Defense counsel said his closing argument would focus on the charges that he believed had not been proven beyond a reasonable doubt. Defense counsel's argument focused on the charges pertaining to the December 2016 and January 2017 crimes.

## DISCUSSION

Defendant contends the trial court erred by not sua sponte instructing the jury on the lesser included offense of simple drug possession.

"A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. [Citation.] This sua sponte obligation extends to lesser included offenses if the evidence 'raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense. [Citations.]' [Citations.] . . . 'A criminal defendant is entitled to an instruction on a lesser included offense only if

6

[citation] "there is evidence which, if accepted by the trier of fact, would absolve [the] defendant from guilt of the greater offense" [citation] but *not the lesser*.' " (*People v. Lopez* (1998) 19 Cal.4th 282, 287-288.) "We review the trial court's failure to instruct on a lesser included offense de novo [citations] considering the evidence in the light most favorable to the defendant." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

"[S]imple possession of narcotics is a lesser included offense of possession of narcotics for sale, since one cannot possess narcotics with intent to sell without first being in actual or constructive possession." (*People v. Saldana* (1984) 157 Cal.App.3d 443, 456-457.) In the instant case, the issue presented by defendant is whether there was evidence, or a failure of proof, from which the jury could have concluded that defendant only possessed the methamphetamine and heroin for his personal use, i.e., without an intent to sell.

There was empty, clean packaging in the house, such as plastic bags and balloons. That evidence indicates drugs were being packaged into small portions in the home. There were scales inside the home, which would assist in portioning drugs for sale. There was a cell phone in the home that had various outgoing text messages pertaining to selling drugs, such as providing the price of drugs. A typical dose of methamphetamine is 0.1 of a gram. There were 14.15 grams of methamphetamine inside the home, which would equate to 140 doses of methamphetamine. Investigator Rhodes explained that a person possessing drugs for personal use would not have "quantities this large."

The large quantity of methamphetamine, the tools for sale (scales and packaging), the surveillance camera outside the house, and the outgoing text messages discussing drug prices, support the conclusion that defendant intended to sell the drugs. There was nothing to contradict that conclusion. Defendant used some of his own exhibits (photographs of the house) during cross-examination but did not offer any of his own witnesses. Defendant's trial counsel did not make a closing argument pertaining to these charges and conceded that some of the charges had been proven beyond a reasonable doubt. Defense counsel made no argument explaining why Investigator Rhodes lacked credibility or any other reason why the jury should reject Rhodes's testimony. The strength of the evidence indicating sales, and the lack of any defense argument offering a different theory for the large quantity of individually packaged drugs or any argument as to why the jury should reject Rhodes's testimony causes us to conclude that no question was raised as to whether all the elements of the charged offenses were present.

Defendant asserts the evidence of intent to sell was circumstantial so the jury could have rejected it and concluded that defendant was "stocked up" with drugs for personal use. The only evidence we have seen in the record regarding whether a person would have this quantity of drugs for personal use is Investigator Rhodes's testimony, and he said that a person possessing drugs for personal use would not have "quantities this large." Therefore, if the jury rejected the evidence of scales, text messages, surveillance cameras, and clean packaging, but accepted the drug possession evidence, then the quantity of drugs by itself would support an intent to sell finding.

Our review of the record suggests that defendant intended to consume some of the drugs and intended to sell some of the drugs. In order for us to be persuaded the jury could have found that defendant intended to consume all of the drugs himself, defendant would need to point us toward evidence that the jury could have relied upon in reaching that conclusion. Defendant does not direct us to such evidence. Accordingly, we are not persuaded that the trial court erred.

Defendant relies on *People v. Walker* (2015) 237 Cal.App.4th 111 to support his assertion that the trial court erred. In *Walker*, the defendant was convicted of possessing marijuana for sale on the basis of evidence that the defendant was sitting in a car in a motel parking lot known for drug sales and prostitution. A woman stood next to the car conversing with the defendant. A sheriff's deputy smelled unburned marijuana when approaching the car. The defendant had "a medical marijuana card and cash totaling $249, consisting of a $100 bill, three $20 bills, four $10 bills, seven $5 bills, and fourteen $1 bills. Neither [the] defendant nor the woman possessed any paraphernalia for ingesting marijuana." (*Id.* at pp. 113-114.) Inside the car, the deputy found "11 plastic baggies, two of which contained a total of 7.13 grams of marijuana and nine that contained a total of 16.1 grams of marijuana, for a combined total of 23.14 grams. [The d]efendant told [the deputy] he had obtained the marijuana from a medical marijuana dispensary six days earlier and had already smoked some of it to alleviate pain and had given some to friends, who smoked it with him." (*Id.* at p. 114.) At trial, the deputy opined that the cash and multiple packages of marijuana were indicative of "street-level

9

marijuana transactions." (*Id.* at p. 114.) During trial, the "defendant admitted he possessed the marijuana but argued it was for his own personal use." (*Ibid.*)

The trial court said it would not instruct the jury on the lesser included offense of simple possession. The appellate court concluded that the trial court prejudicially erred. (*People v. Walker*, *supra*, 237 Cal.App.4th at p. 114.) The appellate court explained that a jury could reasonably find the defendant possessed the marijuana for personal consumption because the deputy "observed no sales taking place and found no scales or documents indicative of sale activity; and [the] defendant possessed a medical marijuana card and told [the deputy] the marijuana was for his own use to alleviate pain." (*Id.* at p. 117.)

The instant case is distinguishable from *Walker* because (1) there is no evidence defendant claimed the drugs were solely for his personal use, whereas in *Walker* the defendant offered an explanation for the large quantity of drugs, i.e., he had been to a dispensary days earlier and he shared the drugs with friends; (2) defendant offered no argument that he did not intend to sell the drugs, which indicates there was no question about the intent to sell element having been met; and (3) there was strong evidence of sales in the instant case, such as scales, empty packaging, outgoing text messages giving drug prices, and a surveillance camera, whereas in *Walker* the evidence of sales was weaker and could more easily be explained away.

Defendant also relies upon *Saldana*, *supra*, 157 Cal.App.3d 443, to support his assertion that the trial court had a sua sponte duty to instruct on simple possession. In *Saldana*, the defendant was charged with possessing heroin and marijuana for sale. The

defendant asserted the trial court erred by not instructing the jury sua sponte on simple possession of heroin. (*Id.* at p. 449.) The appellate court concluded the trial court prejudicially erred by not giving the instruction. (*Id.* at p. 450.)

In *Saldana*, the police executed a search warrant at the defendant's home; where 18 balloons of heroin were found inside the headboard of the defendant's mother's bed, in the bedroom that the defendant shared with his mother. (*Saldana*, *supra*, 157 Cal.App.3d at p. 450.) When police entered the bedroom, the defendant was laying on his mother's bed. Police said the defendant reached into the headboard, but the defendant said that was untrue. (*Id.* at pp. 450, 452.) Six bags of marijuana were found in the dresser of the same bedroom. (*Ibid.*) When confronted, the defendant admitted selling marijuana, but did not make an admission regarding the heroin. (*Id.* at p. 451, fn. 1.) In the basement of the house, officers found the defendant's brother, Manuel. Manuel was under the influence of heroin and had 135 puncture wounds on his arms. (*Ibid.*) Manuel sold heroin. (*Id.* at p. 455.) The defendant did not use heroin. (*Ibid.*)

The appellate court explained that the only connection between the defendant and the heroin was that it was found in a headboard in his bedroom and that the defendant may have reached into the headboard when police arrived. (*Saldana*, *supra*, 157 Cal.App.3d at p. 455.) The appellate court reasoned that the jury could have found the defendant "possessed the heroin for his brother who was a known user." (*Id.* at p. 457.) The appellate court explained that this possibility was supported by the evidence that some of the balloons were cut open, which would indicate they were not packaged for sale but were "kept by Manuel for his own personal use." (*Ibid.*)

11

*Saldana* and the instant case both involve people who abused drugs. In *Saldana*, the defendant's brother abused drugs and in the instant case, defendant abused drugs. However, unlike *Saldana*, the instant case lacks evidence, other than sales, to explain the large quantity of drugs in defendant's possession. A typical dose of methamphetamine is 0.1 of a gram. Defendant had methamphetamine weighing 14.15 grams with packaging. That means defendant had approximately 140 doses of methamphetamine. Defendant also had 34 individual bindles of heroin. The only evidence explaining why defendant had such a large quantity of drugs in his possession is that he was selling the drugs in addition to consuming them himself. Accordingly, because *Saldana* involved evidence from which one could infer the defendant was not selling heroin, i.e., he possessed the heroin for his brother, and the instant case lacks evidence supporting a reasonable non-sales explanation for defendant's possession of the drugs, we conclude the instant case is distinguishable from *Saldana*.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

SLOUGH
J.

RAPHAEL
J.

12